# In the United States Court of Federal Claims

No. 25-621
Filed Under Seal: November 13, 2025
Reissued: December 3, 2025[*]

```
* * * * * * * * * * * * * * * * *
                                *
DEV TECHNOLOGY GROUP, INC,      *
                                *
                Plaintiff,      *
                                *
        v.                      *
                                *
THE UNITED STATES,              *
                                *
                Defendant,      *
                                *
* * * * * * * * * * * * * * * * *
```

*William A. Shook*, The Law Offices of William A. Shook PLLC, with whom was *Steven Barentzen*, The Law Office of Steven Barentzen, both of Washington, D.C., for Plaintiff Dev Technology Group, Inc.

*Emma E. Bond*, Senior Trial Counsel, with whom were *Douglas K. Mickle*, Acting Deputy Director, *Patricia M. McCarthy*, Director, and *Brett A. Shumate*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, Department of Justice, all of Washington, D.C., for the government, and *Shirin E. Ahlhauser*, Assistant General Counsel, U.S. General Services Administration, of Washington, D.C., of counsel.

## OPINION AND ORDER

**SOMERS,** Judge.

As the Court has observed on several occasions, most recently in *KL3, LLC v. United States*, it is black letter law that allegations of agency error alone are insufficient to establish standing to bring a bid protest, and proof of agency error alone is insufficient to succeed on the merits of a bid protest. *See* 176 Fed. Cl. 657 (2025). Rather, it is axiomatic that a protestor must plausibly allege prejudicial error in its complaint to establish standing (both Article III and statutory) and that it must, drawing on the administrative record, prove prejudicial error in its motion for judgment on the administrative record ("MJAR") to be successful on the merits of a

---

[*] Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties did not provide any proposed redactions of confidential or proprietary information; however, this version of the opinion contains minor typographical and stylistic corrections.

bid protest. Without more, allegations and proof of agency error alone—no matter how obvious or egregious—can neither open the courthouse door for a protestor nor lead to success on the merits of a bid protest.

A sine qua non of standing in a bid protest is that a protestor allege that it could compete for the contract if the challenged agency errors were corrected. Relatedly, the concept of prejudicial error then requires that the protestor prove those allegations on the merits in what has been termed a "trial on the paper record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). As was the case in *KL3*, the protestor here, Dev Technology ("Dev Tech"), makes no factual allegations in its complaint and offers no proof on the merits that it could compete for the contract at issue. Beyond a few sparsely placed conclusory sentences, there is nothing in Dev Tech's complaint or its merits briefing that even attempts to establish that Dev Tech could actually do the work required by the contract at issue. Instead, Dev Tech essentially asserts, "I sued, therefore I have standing." *See, e.g.*, ECF No. 31 at 106:10–23. But while establishing standing in a bid protest is not an onerous task, it is also not satisfied by bare assertions sounding in Cartesian rhetoric. Dev Tech's approach to meeting its burden to establish standing and prove prejudice is insufficient both in its allegations and on the merits.

This is a pre-award protest brought by a protestor that did not bid on the solicitation. In such a case—in which there was no proposal or therefore no evaluation thereof—it is incumbent on the protestor to offer the Court some indication of the protestor's capability to perform the contract and some indication that the errors alleged were indeed what kept the protestor from submitting a proposal. Rather than attempting to meet this standard through plausible factual allegations or perhaps a declaration attached to its complaint, Dev Tech simply offers the legal conclusion that it "is a prospective offeror with a direct economic interest in this procurement" in its complaint and several equally conclusory statements on the merits. ECF No. 1 ¶ 5.

Dev Tech needed to do more. Although it is clear that aside from perhaps one of Dev Tech's five protest grounds the agency did not err, without plausible factual allegations establishing standing, any analysis of the alleged errors would amount to an advisory opinion and allow this protest to become a "vehicle for the vindication of the value interests of concerned bystanders." *Allen v. Wright*, 468 U.S. 737, 756 (1984) (quoting *United States v. SCRAP*, 412 U.S. 669, 687 (1973)). Therefore, the Court's below analysis will focus on Dev Tech's general lack of standing and, additionally, its lack of standing as to each of the five counts of its complaint. The Court will also address the interrelated issue of Dev Tech's failure to meaningfully address merits prejudice beyond a few conclusory assertions.

## BACKGROUND

### A.    Factual Background

In this pre-award bid protest, Dev Tech protests the Alliant 3 solicitation for certain "unreasonable terms of the Solicitation that exceed the legitimate needs of the Agency." ECF No. 1 ¶ 1. Dev Tech is a "mid-sized other than small business concern" incorporated in Washington, D.C. that allegedly is a "prospective offeror with a direct economic interest in [the Alliant 3] procurement." *Id*. ¶¶ 2, 5.

The Alliant 3 solicitation is a Governmentwide Acquisition Contract ("GWAC") issued by the General Services Administration ("GSA" or "agency") for IT services across the federal government. Tab 44 at AR 5912; *see also* 48 C.F.R. § 2.101 (defining a GWAC as a "task-order or delivery-order contract for information technology established by one agency for Governmentwide use" that is operated "[b]y an executive agent"). The Office of Management and Budget designated the GSA as "the executive agent" for the Alliant 3 GWAC procurement. Tab 9 at AR 1145; Tab 44 at AR 5912. Alliant 3 is to be the successor to Alliant 2, which is currently the largest GWAC administered by any agency. Tab 9 at AR 1145. Alliant 2 supports "68 customers from Federal Civilian Agencies and the Department of Defense," totaling "544 task orders worth approximately $40.9 billion." *Id*. at AR 1146. The agency envisions Alliant 3 as a continuation of Alliant 2, allowing for, *inter alia*, "[i]mmediate access to a highly qualified contractor pool" and "[f]lexibility to award all contract types and hybrid contract types (except BPAs and letter contracts)." *Id*. The agency asserts that "Alliant 3 is integral to ensure the Government has a streamlined option through an established vehicle for IT service-based solutions . . . [because] it creates an acquisition avenue for agencies that may not have the required manpower, resources, budget, or lead time to conduct a standalone acquisition." *Id*. at AR 1145.

Accordingly, Alliant 3 is intended to service diverse IT needs across the federal government. *Id*. To this end, the agency issued a solicitation that seeks to "ensure a high-performing contractor pool," ECF No. 20 at 1 (citing Tab 44 at AR 6230–34), scoring offerors on factors that the agency deems predictive of future success, such as relevant experience, *see, e.g.*, Tab 44 at AR 6230. The agency's "best value basis for awards will be determined by the Highest Technically Rated Offerors with a Fair and Reasonable Price (HTR/F&RP) approach." Tab 44. at AR 6225. The technical evaluation encompasses four areas: "Relevant Experience," "Past Performance," "Systems, Certifications, and Clearances," and "Organizational Risk Assessment." *Id*. at AR 6228. As part of this technical evaluation, the solicitation provides for a point-scoring system that assigns a numerical score to each offeror evaluated. *Id*. at AR 6225. The agency contemplates awarding 76 base contracts under the Alliant 3 master contract, with awards to the 76 highest scoring offerors with a fair and reasonable price that meet all the "Acceptability Review requirements." *Id*. at AR 6225–26. An offeror can earn a maximum of 88,200 points, but there is no minimum points threshold for award. *See generally id*. at AR 6225–36 (outlining evaluation factors for award). These points are awarded based on criteria set by the solicitation and a "screening process . . . to verify support documentation for all the applicable evaluation elements submitted . . . ." *Id*. at AR 6226. The scoring provisions at issue in this protest include point awards based on contractor teaming arrangements, audited or approved accounting, purchasing and estimating systems, verified experiences with emerging technologies, and points awarded for relevant experience servicing unique federal customers. *Id*. at AR 6230–34. These provisions are described in further detail below.

### 1.     Points for Contractor Teaming Arrangements

Section L.5.6 of the solicitation, titled "Organizational Risk Assessment," allows for joint ventures, partnerships, or contractor teaming arrangements ("CTAs") that are formed "to act as a potential Prime Contractor" to bid on the solicitation. *Id*. at AR 6172, 6220. The solicitation

allows for these "Joint Venture Offerors" to earn points for "each relevant experience project . . . in which all members of a CTA have previously performed [] exclusively together. . . . " *Id.* at 6220.  For offerors to earn these points, they must have "previously performed work on a contract/order," or "all members of the Joint Venture or Partnership Offeror [must] have previously performed work exclusively together (all JV or Partnership members must have worked together on a contract/task order, with no other entities involved in performance) on a contract/order." *Id.*

The agency justified these limitations on awarding relevant experience project points to joint ventures because of performance risks associated with CTAs in which the members of the CTA "may lack sufficient relevant experience and past performance working together." Tab 18 at AR 1272.  As an example, the agency stated:

> [T]he Government recognizes the performance complexities of providing overseas performance of a sophisticated enterprise-wide emerging technology IT solution for a classified system under a cost reimbursable type contract (that requires an approved accounting system), when the clearance belongs to one CTA member, the IT solution capability belongs to another CTA member, the overseas business capabilities belong to a different CTA member, and the approved accounting system belongs to yet another CTA member.  The learning curve and multi-entity coordination requirements for combining the types of performance anticipated for Alliant 3 between two or more CTA entities risks a negative impact on performance, while a prior history of the CTA entities successfully working together lessens the likelihood of a potential negative outcome.

*Id.*  The agency further noted that "[a] combination of separate capabilities that have never functioned together does not necessarily equal a performance capability that operates at a level equal to the sum of its parts." *Id.*  Thus, the contracting officer concluded that these restrictions were "deemed necessary and proper by the Government to minimize the performance risk inherent in contractor teaming arrangements that lack actual performance experience as a cohesive teaming arrangement." *Id.* at AR 1276.

### 2.    Points for Audited or Approved Accounting, Purchasing, and Estimating Systems

Section L.5.4 of the solicitation awards offerors points for having, *inter alia*: (1) an adequate or acceptable accounting system; (2) an approved or acceptable purchasing system; and (3) an approved or acceptable estimating system.  Tab 44 at AR 6212–14.  Offerors can earn 6,000 points for an accounting system that was audited and found adequate by the Defense Contract Management Agency ("DCMA"), Defense Contract Audit Agency ("DCAA"), or a Chartered Financial Analyst ("CFA"), or 3,000 points for an accounting system that was audited and found acceptable by a Certified Public Accountant ("CPA"). *Id.* at AR 6233.  Next, an offeror can earn 1,500 points for a purchasing system reviewed and approved by DCMA or a CFA, or 750 points for a purchasing system reviewed and found acceptable by a CPA. *Id.* Finally, an offeror can earn 200 points for an estimating system that was audited and approved

by DCMA, DCAA, or a CFA, or 100 points for an estimating system audited and found acceptable by a CPA.  *Id.*

In short, Section L.5.4 awards offerors twice the number of points for systems audited by a federal agency as it does for systems audited by a CPA.  In deciding how to allocate points under this provision, the agency found that "CPA point parity with CFAs, DCAA and DCMA is not warranted" because "CPAs are not authorized by federal law and regulation to act as a certifying body (such as DCMA or a CFA), and CPAs can not [sic] approve or determine the adequacy of a system."  Tab 25 at AR 1418.  The agency further justified its scoring system by stating that "third-party independent auditors determine the acceptability of a vendor's accounting system based on their application of Generally Accepted Accounting Principles (GAAP), while the government determines adequacy of an accounting system based on the higher standard of Generally Accepted Government Accounting Standards (GAGAS), which also requires audit peer review."  *Id.*

### 3.    Points for Verified Experiences in Emerging Technologies

Section L.5.2.4 of the solicitation awards points to offerors with verified emerging technology relevant experience.  Tab 44 at AR 6231.  The agency, "[b]ased on IT Industry research, Community Survey, and Federal Policy, [ ] developed a list of eleven (11) Emerging Technologies (ETs) as the most likely ETs to become relevant for use in Alliant 3."  Tab 12 at 1255.  Accordingly, offerors must demonstrate experience with these eleven emerging technologies to earn these points.  *See* Tab 44 at AR 6231.  The agency reasoned that "Alliant 3 is designed to be the premier[] IT Services vehicle for the federal government and as such, it is important that ETs be identified as integral to the future of IT services in the United States."  Tab 12 at AR 1256.  Therefore, the agency asserted that "[i]t is equally important that Offerors are evaluated and scored based on their technical experience with ETs."  *Id.*  Furthermore, "[t]hese [eleven] ETs will be evaluated with point scoring that reflects the anticipated future importance of these ETs."  *Id.* at 1255.

Consequently, offerors can earn points for verified past experience in eleven different emerging technology categories: artificial intelligence, big data, cloud computing, cybersecurity, edge computing, extended reality, health information technology, the internet of things, mobile information technology, quantum computing, and zero trust networks.  Tab 44 at AR 6195–6203.  The solicitation provides that an offeror "may submit a MAXIMUM of three (3) Emerging Technology Relevant Experience Projects" for each of these categories "for a total of [thirty-three] Emerging Technology Experience projects."  *Id.* at AR 6195.  Offerors are awarded 100 points for each first instance of relevant experience in each emerging technology category, 200 points for the second instance in an emerging technology category, and 300 points for the third instance in an emerging technology category.  *Id.* at AR 6231.  Thus, the solicitation awards a maximum of 6,600 points for verified emerging technology experiences.  *Id.*

In order to earn points for emerging technology relevant experiences, Section L.5.2.4.2 requires that the offeror submit verification documents.  *See id.* at AR 6204.  Under this provision, the solicitation allows offerors to earn points for experience in emerging technologies

based on work they performed as a subcontractor. *Id*. at AR 6206. An offeror may use subcontractor work for only "the value and scope of the work subcontracted." *Id*.

### 4.    Points for Unique Federal Agency Customers

The solicitation awards points for "a maximum of seven (7) distinct Primary NAICS [North American Industry Classification System] Code Relevant Experience Projects," reflecting past performance in one of the acceptable NAICS codes outlined in the solicitation. Tab 44 at AR 6186 (emphases omitted); *see id*. at AR 6187–88. Section L.5.2.3.4 awards additional points "for each unique Federal Government Customer" serviced under the "primary NAICS Code Relevant Experience Project submitted under L.5.2.3.1." *Id*. at AR 6193. According to the agency, Alliant 3 is to "be available for use by any federal agency," Tab 5 at AR 457, and the contracting officer determined that "enlisting contractors with experience in managing multiple agency customers should play a moderate role in the evaluation scoring of the Alliant 3 contract," Tab 23 at AR 1409. To this end, the solicitation awards 500 points per relevant experience project submission with a unique federal agency for a maximum of 3,500 points for the seven maximum relevant experience projects allowed by the solicitation. Tab 44 at AR 6230–31.

## B.    Procedural History

The operative version of the Alliant 3 solicitation was issued on March 12, 2025, with proposals due on April 11, 2025. Tab 43 at AR 5535–36. On April 10, 2025, Dev Tech filed this protest as a "prospective offeror" challenging several of the scoring provisions of the Alliant 3 solicitation. *See generally* ECF No. 1. Specifically, Dev Tech challenges solicitation provisions awarding: (1) points for CTAs; (2) points for federal-agency-audited or approved accounting, purchasing, and estimating systems; (3) points for experiences with emerging technologies and (4) the verification procedures for those experiences; and (5) points for relevant experience projects with multiple federal government customers. *See id*. ¶¶ 34–67. Subsequently, Dev Tech moved for judgment on the administrative record, ECF No. 19, and the government responded and cross-moved for judgment on the administrative record, ECF No. 20. Following briefing and oral argument, the parties' motions are ripe for consideration.

## DISCUSSION

## A.    Legal Standard

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with jurisdiction over any "action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In exercising its bid protest jurisdiction, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706 of title 5," 28 U.S.C. § 1491(b)(4), which require the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). To succeed in a bid

protest, a protestor must make two showings. *Bannum*, 404 F.3d at 1351. First, a protestor must show error, meaning that the agency violated the Administrative Procedure Act ("APA") standard. *Id.* Second, a protestor must demonstrate that such error was prejudicial. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

To demonstrate that an agency's actions were in error, a protestor must establish that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Accordingly, a procurement decision may be set aside if the protestor proves that "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)). A protestor must then show that this conduct constituted "a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *Data Gen. Corp.*, 78 F.3d at 1562 ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."); *see also Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 996–97 (Fed. Cir. 2021) ("In particular, the challenger of agency action generally bears the burden of showing that an error was harmful—that is, that it was prejudicial."). To establish prejudice in a pre-award challenge, a protestor must show a "non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine*, 575 F.3d at 1362.

Generally, bid protests are decided on cross-motions for judgment on the administrative record under Rule 52.1 of the Rules of the U.S. Court of Federal Claims ("RCFC"). In deciding whether to grant an MJAR, the Court must "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354. Accordingly, the Court assesses "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006). Put differently, "in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record." *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 504 (2021).

## B.    Analysis

Dev Tech alleges that the agency has committed five errors in the solicitation for the Alliant 3 procurement. ECF No. 1 ¶¶ 34–67. However, to bring a bid protest based on these alleged errors, Dev Tech must establish that it has standing. To meet this burden, Dev Tech must plausibly allege in its complaint that the agency's alleged errors will result in Dev Tech suffering or being likely to suffer an injury in fact, that was caused or will be caused by the government, and that is likely redressable by an order of this Court. *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In addition, and interrelated to this showing, Dev Tech must also

prove on the merits not only that the agency committed an error in the procurement process but that this error was prejudicial—that is, that the error caused Dev Tech to suffer a non-trivial, competitive injury.[1]  In this protest, Dev Tech fails to meet either burden.  It does not plausibly alleges standing generally or with regard to any of its five protest grounds, nor does it prove that any of the alleged errors were prejudicial.  Accordingly, for the reasons discussed below, the Court must dismiss Dev Tech's protest for lack of standing.

1.    **Dev Tech Has Not Plausibly Alleged That It Has Article III Standing to Protest the Solicitation.**

Article III of the Constitution limits of the exercise of the judicial power to "Cases" and "Controversies."  U.S. CONST. art. III, § 2.  From this limitation stems the standing doctrine, which helps maintain the "judiciary's proper role in our system of government . . . ."  *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976).  The standing doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), and ensures that the courts do not become an open forum for litigants to press "general complaints about the way in which the government goes about its business," *Allen*, 468 U.S. at 760.  Thus, standing "is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  While this Court is "an Article I court, [it] applies the same standing requirements enforced by other federal courts created under Article III."  *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (citation omitted).  Therefore, before the Court can adjudicate the merits of this protest, it must determine whether Dev Tech has satisfied its burden to establish the elements comprising the "irreducible constitutional minimum" of standing.  *Lujan*, 504 U.S. at 560; *see also Reoforce, Inc. v. United States*, 853 F.3d 1249, 1263 (Fed. Cir. 2017) ("[B]ecause standing is a jurisdictional prerequisite, we must independently determine whether [plaintiff] has satisfied its Article III standing requirements.").

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Put differently, "[p]laintiffs must demonstrate a 'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' . . . ."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  In so doing, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'"  *Id.* at 101–02 (citing cases).

"The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]."  *Lujan*, 504 U.S. at 561.  "[E]ach element must be supported in the same way as

---

[1] In most cases, because a protestor's failure to sufficiently plead Article III standing is fatal to its case, the Court would start and end its analysis with standing.  However, because Dev Tech's failure to allege Article III standing is intertwined with, and exemplified by, its failure to attempt to prove that it was prejudiced on the merits, the Court will analyze both issues together.

any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id*. For example, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id*. (alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). Still, even at this stage of the litigation, "the plaintiff must 'clearly . . . allege facts demonstrating' each element [of standing]." *Spokeo, Inc.*, 578 U.S. at 338 (omission in original) (quoting *Warth*, 422 U.S. at 518). Conversely, at trial, "those facts . . . must be 'supported adequately by the evidence adduced at trial.'" *Lujan*, 504 U.S. at 561 (quoting *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979)). Finally, the Court itself can raise the issue of standing at any stage of the litigation. *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (alteration in original) (quoting *Allen*, 468 U.S. at 750)).

In a post-award bid protest, a protestor can usually establish that it has standing "because it claims an injury, namely rejection of its bid, which is traceable to the allegedly defective procurement process and which could be redressed by this Court." *Barbaricum LLC v. United States*, 172 Fed. Cl. 186, 195 (2024). But in a pre-award bid protest in which a protestor did not bid on the contract, the protestor's standing is not so obvious. Rather, in such cases, the protestor, at minimum, must allege that it could compete for and perform the contract to be awarded by the protested solicitation. *See KL3*, 176 Fed. Cl. at 667 ("Because if a protestor could not perform that contract, there can be no injury no matter how egregious the agency's alleged error, and the Court cannot provide any redress to an incapable protestor based on any alleged errors."). Otherwise, the protestor would lack a redressable injury, and it would remain "[a] stranger to the procurement at issue . . . ." *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 272 n.30 (2024).

Here, Dev Tech did not submit a proposal in response to the Alliant 3 solicitation. ECF No. 31 at 102:7–11. More problematically, Dev Tech fails to allege—plausibly or otherwise—that it could compete for the Alliant 3 solicitation. Instead, the factual allegations in Dev Tech's complaint regarding its standing and capability to compete are limited to a single conclusory paragraph:

> Dev Technology has standing as an interested party. 28 U.S.C. § 1491(b)(1). Dev Technology is a prospective offeror with a direct economic interest in this procurement. Dev Technology would possess a substantial chance of an award to a properly issued Solicitation that eliminates requirements that exceed GSA's legitimate needs that will likely and unreasonably prevent Dev Technology from obtaining the number of evaluated points necessary to be awarded a contract.

ECF No. 1 ¶ 5. Crucially, nowhere in its complaint (or its merits briefs for that matter) does Dev Tech plausibly allege facts that support its ability to do the work contemplated by the solicitation.

At the pleading stage, a plaintiff's "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Thus, merely echoing to the Court the legal standard for standing in a bid protest is wholly insufficient to establish standing. *See id.* ("Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (alteration in original) (quoting *Twombly*, 550 U.S. at 557)). In its complaint, Dev Tech merely repackages the definition of an interested party and the post-award bid protest standard for statutory standing to claim that it has standing. But these statements are legal conclusions, and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Dev Tech plainly fails to allege in its complaint, or in materials attached thereto, that it can perform the work required by the Alliant 3 solicitation. Moreover, because Dev Tech did not bid on the solicitation, there is no underlying proposal to serve as the factual basis for Dev Tech's capability to perform and, therefore, its standing more broadly. However, it is Dev Tech's burden to allege that it has standing, and it has not alleged any facts that even begin to meet this burden. In other words, the issue here is not that the Court considered Dev Tech's factual allegations and found that they could not plausibly give rise to standing; it is that Dev Tech failed to put forth such facts altogether.

To be clear, Dev Tech's burden is not an onerous one. In a pre-award protest, a protestor must allege just enough facts to plausibly support the conclusion that it could have competed for and performed the procurement at issue. *See KL3*, 176 Fed. Cl. at 667. Thus, Dev Tech simply needed to put forth *some* plausible factual allegations in its complaint that would have supported its legal conclusion that it has standing as an interested party. For instance, Dev Tech could have alleged that it performed IT services similar to those called for by the Alliant 3 procurement for federal agencies or a comparable non-government customer. *See* Tab 44 at AR 6195–03. Yet, from what is alleged in the complaint, the Court cannot even definitively ascertain whether Dev Tech is an IT services company. Indeed, from its complaint, the sole indication that Dev Tech is able to perform the IT services contemplated by Alliant 3 is that Dev Tech has "Technology" in its company name. This, of course, is a far cry from the plausible factual allegations necessary to establish standing.

Dev Tech's allegations also fall well short of what other similarly situated protestors have alleged to establish standing in protests in which they did not bid on the underlying procurement. For instance, in a recent bid protest before the undersigned, the protestors needed to establish that they were prospective offerors for the Department of Defense ("DOD") Global Household Goods Contract ("GHC") for moving DOD personnel even though they did not compete for the contract at issue. *See* Redacted Complaint, *Suddath Cos. v. United States*, No. 24-cv-1836, 2025 WL 2017240 (Fed. Cl. July 17, 2025), ECF No. 21. One of the protestors, Suddath, established standing through the factual allegations in its complaint. Specifically, Suddath plausibly alleged that it could perform the moving contract at issue by alleging that it already performs work for DOD similar to that contemplated by the GHC. *See id.* ¶¶ 28–38. Suddath alleged, *inter alia*, that it "is currently one of the largest military household goods providers . . . for domestic and international moves," *id.* ¶ 29, "has provided these services for more than 75 years and successfully relocated over one million military families around the world," *id.* ¶ 30, and has a

network of agents and carriers that can "handle the 350,000 moves DOD will require annually under the [GHC] program," *id.* ¶ 31. Furthermore, Suddath attached a declaration attesting to similar facts about its capabilities. *See* Declaration, *Suddath Cos.*, 2025 WL 2017240, ECF No. 21-1. Thus, Suddath plausibly alleged that it could perform the contract at issue, notwithstanding its decision to refrain from competing for the GHC as solicited.

In that same bid protest, co-protestor Total Military Management, Inc. similarly pled that it is "a leading technology-enabled provider of household goods relocation services to U.S. servicemembers, government employees, and their families," along with numerous other supporting allegations that remain under seal. *See* Redacted Complaint, *Total Mil. Mgmt., Inc. v. United States*, No. 24-cv-2029 (Fed. Cl. Dec. 10, 2024), ECF No. 2 ¶ 1. And the third protestor, National Holding Company ("National"), made similar plausible allegations regarding its subsidiaries, including that its subsidiary, National Forwarding Co., Inc. ("NFC"), "is currently one of the largest participants in [the Defense Personal Property Program], managing over 80 companies and performing around 15,000 domestic and 5,000 international shipments per year," that "NFC is responsible for 10% of domestic moves under [the program]," and that "National owns 20 transportation providers actively participating in the . . . program." Redacted Complaint, *Nat' Holding Co., Inc. v. United States*, No. 24-cv-2112 (Fed. Cl. Dec. 23, 2024), ECF No. 2 ¶ 1 (citations omitted).

Like the protestors in *Suddath* that did not bid on the procurement they were protesting, Dev Tech could have alleged facts in its complaint that plausibly establish its underlying capability to perform the Alliant 3 contract. Dev Tech could have made allegations related to previous government IT contracting work or contracting work for private businesses. It could have even made allegations regarding its workforce's general capabilities to complete the work required by the Alliant 3 contract. But what Dev Tech could *not* do to meet its burden was sit on its hands and offer the Court nothing more than the legal conclusion that it "is a prospective offeror with a direct economic interest in this procurement" that "would possess a substantial chance of an award to a properly issued Solicitation." ECF No. 1 ¶ 5. If such a bare legal conclusion was all that was required to establish standing, the constitutional standing requirement would be read right out of bid protest litigation. The Court cannot simply take a protestor's word that it would not have filed the protest were it incapable of performing the contract that it is challenging.

Moreover, even in its MJAR, Dev Tech's attempt to argue that it meets its standing burden is limited to one conclusory statement: "Dev Tech is an interested party because it '(1) is an actual or prospective bidder; and (2) possess[es] the requisite direct economic interest,'" ECF No. 19 at 2 (quoting *Sys. Applications & Techs. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012)). But again, Dev Tech's factually unadorned recitation of the legal standard does not prove its case. Dev Tech fails to put forth any argument, much less a fact-based one, to plausibly allege that it could have been awarded the Alliant 3 procurement in the first place. Dev Tech thus remains a "stranger to the procurement." *Superior Waste Mgmt.*, 169 Fed. Cl. at 272 n.30. However, "[f]or a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting *TransUnion*, 594 U.S. at 423).

At bottom, Dev Tech ignores its standing burden. Instead, it voices generalized grievances about the scoring provisions that will be used to award the seventy-six Alliant 3 contracts. Unfortunately for Dev Tech, "[t]he relevant showing for purposes of Article III standing . . . is . . . injury *to the plaintiff*." *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 181 (2000) (emphasis added). Dev Tech fails to show how it plausibly could have been injured by the alleged solicitation errors because it fails to plausibly allege that it could even compete for the Alliant 3 procurement in the first place.[2] And when challenged at oral argument whether it has standing as to one of its protest grounds, Dev Tech essentially asserted that it has standing because it filed this bid protest. *See* ECF No. 31 at 106:19–23. But circular arguments do not satisfy Dev Tech's burden. If they did, every plaintiff whose standing has ever been challenged would have a similar rejoinder, and Article III's case or controversy requirement would become a dead letter.

**2.      Additionally, Dev Tech Has Not Plausibly Alleged That It Has Article III Standing to Protest Any of the Five Alleged Errors in the Solicitation.**

Dev Tech's failure to show that it has the capacity to perform an Alliant 3 contract alone is fatal to its bid protest. But even when examining each alleged agency error, Dev Tech fails to establish standing to raise any of its protest grounds. Moreover, as a closely related matter, Dev Tech fails to prove on the merits that it was prejudiced by any of these alleged errors. While the Court would not ordinarily discuss merits prejudice after determining that a protestor lacks standing, the two issues are so intertwined here that analyzing merits prejudice helps exemplify Dev Tech's fatal standing flaws.

**a.      Dev Tech fails to allege standing or prove prejudice from the solicitation's limitation on awarding points for past experience to contract teaming arrangements.**

Although the solicitation allows offerors to earn points for their performance as a subcontractor, Section L.5.6 (Organizational Risk Assessment) limits the circumstances in which those points may be earned. This provision, *inter alia*, requires "all Members of a CTA [to] have previously performed, exclusively together, for Primary NAICS Code Relevant Experience projects outlined in Section L.5.2.2 for Organizational Risk Assessment." Tab 44 at AR 6220 (emphasis omitted). Dev Tech alleges that this provision is irrational because it treats "single offerors" differently from joint venture CTAs subject to these restrictions. *See* ECF No. 19 at 21. Dev Tech reasons that the "alleged GSA stated risk of 'negative impact on performance' . . .

---

[2] Without plausibly alleging its capability to compete for the Alliant 3 procurement, Dev Tech essentially concedes all three prongs of the standing test. A company that does not have the capability to compete for a contract cannot have suffered an injury in fact by the alleged procurement errors (unless, of course, fixing the procurement error would allow the company to compete). Any "injury" that the company did suffer would be caused by the company's lack of capability, not by the government. And finally, any "injury" would not be redressable by the Court because fixing the procurement error would not suddenly make the company capable of performing the underlying contract.

applies equally to a single offeror that offered relevant experience projects performed by multi-entities, i.e., the prime contractor and its subcontractors." ECF No. 25 at 17 (quoting Tab 18 at AR 1272).

But from the outset, Dev Tech fails to plausibly allege in its complaint that it has standing to challenge this provision of the solicitation. And, on the merits, Dev Tech fails to prove that it was prejudiced by this alleged error. That is, Dev Tech fails to prove that it suffered "a non-trivial competitive injury." *Weeks Marine*, 575 F.3d at 1363 (quoting *WinStar Commc'ns., Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)). "[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision. The protestor must show prejudice under the usual standard." *Sys. Stud.*, 22 F.4th at 998. In other words, on the merits, the protestor must *prove* that the agency's error was prejudicial, while at the pleading stage, a protestor must, at minimum, plausibly *allege* that the agency's error injured it, along with the other *Lujan* factors.

Dev Tech misses the mark on both counts. Notably absent from Dev Tech's complaint is any plausible allegation that it was prejudiced by the points limitation provision for CTAs. Dev Tech merely states that this provision "unreasonably limit[s] its ability to offer the Government a highly ranked proposal by creating a proper joint venture." ECF No. 1 ¶ 67. However, to plausibly allege that it suffered a redressable injury from the CTA provision, Dev Tech needed to allege, at the very least, that it explored forming a CTA but abandoned doing so because of the CTA scoring provision. Without any allegation that Dev Tech even contemplated entering a CTA, it lacks standing to challenge this provision. Only an entity that sought to enter a CTA but was deterred from doing so by the CTA scoring provision could claim injury based on the provision. Moreover, only such an entity would benefit from the Court's redressing of the alleged error by requiring the agency to fix it (assuming it is in error). In other words, unless Dev Tech wanted to enter a CTA to become more competitive for the procurement (a fact that it does not allege, plausibly or otherwise) and was essentially prevented from doing so by this provision (again, not alleged), Dev Tech has no personal stake in the adjudication of this provision's rationality. *All. for Hippocratic Med.*, 602 U.S. at 382 ("[T]o sue in federal court, a plaintiff must show that he or she has suffered or likely will suffer an injury in fact.").

This standing flaw is reemphasized on the merits, as Dev Tech's MJAR does not even make an argument, much less prove, that it was prejudiced by the alleged error. Instead, Dev Tech states in conclusory fashion that it was "prejudiced in its ability to decide the best possible bidding strategy for being awarded a contract under the terms of the Solicitation." ECF No. 19 at 23. Dev Tech's tenuous and conclusory hypothetical injury—that the alleged error hindered its ability to decide on the best bidding strategy (for a bid it did not submit)—is not enough to prove merits prejudice. As with its insufficient allegations related to standing to challenge this provision, Dev Tech makes no effort to prove on the merits that it either entered a teaming arrangement or would have entered into such an arrangement absent the allegedly erroneous provision. Thus, Dev Tech's challenge is an academic exercise at best. As the government notes, "Dev Technology has not shown that making it easier for *all* offerors to earn points for certain relevant experiences, business systems, or organizational risk would advance Dev Technology in the competition for one of the 76 total slots." ECF No. 20 at 42. Accordingly, Dev Tech's challenge to Section L.5.6 of the solicitation would fail on the merits because it has

not proved that it was prejudiced by the agency's alleged error, even if it had standing to challenge the provision in the first place.

> **b.      Dev Tech fails to allege standing or prove prejudice from the solicitation provision awarding more points for systems audited by DCAA, DCMA, or a CFA.**

Dev Tech next challenges Section L.5.4 of the solicitation, which awards offerors points for their accounting, estimating, and purchasing systems.  Tab 44 at AR 6212–14.  Recall, the solicitation awards offerors 6,000 points for accounting systems audited and found adequate by DCMA, DCAA, or a CFA; 1,500 points for purchasing systems reviewed and approved by DCMA or a CFA; and 200 points for estimating systems audited and approved by DCMA, DCAA, or a CFA.  *Id.* at AR 6233.  Offerors earn half the numbers of points (3,000, 750, and 100 points respectively) for their accounting, purchasing, and estimating systems if these systems are audited and found acceptable by a CPA.  *Id.*  The agency asserts that "[t]he maximum potential of 8,100 points for business system audits (9% of total available points) reflects the overall value of audits towards obtaining the optimal contractor quality."  Tab 25 at AR 1418.

Dev Tech concedes that "[i]t is reasonable for GSA to award points to offerors that have accounting systems, purchasing systems, and estimating systems that are compliant with federal standards."  ECF No. 19 at 21.  However, Dev Tech challenges the twofold point difference between systems audited by government agencies and those audited by a CPA.  *Id.*  Dev Tech asserts that the agency's justification for awarding twice as many points for government-audited systems is flawed because the agency incorrectly reasoned that "third-party independent auditors determine the acceptability of a vendor's accounting system based on their application of Generally Accepted Accounting Principles (GAAP), while the government determines adequacy of an accounting system based on the higher standard of Generally Accepted Government Accounting Standards (GAGAS), which also requires audit peer review."  *Id.* at 18 (quoting Tab 25 at AR 1418).  Dev Tech claims that "CPA firms with peer review are able to perform detailed audits and reviews of [business] systems in accordance with the [government's] requirements and standards."  *Id.* at 19–20.  Additionally, Dev Tech argues that the agency's assertion that "CPA audit contributions are of limited value, as CPAs are not authorized by federal law and regulation to act as a certifying body (such as DCMA or a CFA), and CPAs can not [sic] approve or determine the adequacy of a system" is false because "it is only the government contracting officer who approves the adequacy of accounting systems, purchasing systems, and estimating systems."  *Id.* at 20 (quoting Tab 25 at AR 1418).  Thus, Dev Tech asserts that awarding twice as many points for government-audited business systems is irrational when CPAs can audit systems to the same substantive standard.  *See id.* at 18, 21.  Moreover, according to Dev Tech, because an offeror cannot merely request to be audited by the government but rather must be selected for review, the agency's decision to award twice as many points for offerors who happened to have their systems audited was unreasonable.  *Id.* at 21.

However, Dev Tech did not put forth factual allegations in its complaint that plausibly allege (or prove in its MJAR) that it would be eligible to receive points through a CPA-audited system.  Without such an allegation, Dev Tech leaves unanswered the all too important question for Article III standing of "What's it to you?"  *TransUnion*, 594 U.S. at 423 (quoting Antonin

14

Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U.L. REV. 881, 882 (1983)). Again, Dev Tech merely alleges that it "is prejudiced simply because it has not been unilaterally selected by the Government for a Government audit." ECF No. 1 ¶ 52. This is not enough to plausibly allege standing. Nor is its allegation that

> an offeror which has been selected by the Government at the Government's exclusive decision to audit and review the offeror's accounting system, purchasing system and estimating system will receive 5,250 points, while *an offeror* who has equally acceptable, if not better, systems that are compliant with all applicable regulatory requirements, but did not have the good fortune of having its systems audited by the government, will only receive 2,625 points for these three Systems.

ECF No. 1 ¶ 31 (emphasis added). For purposes of standing, the injury that might occur to "an offeror" is irrelevant. What matters is the injury that might occur to Dev Tech if the alleged procurement error is not fixed. That is, the injury must affect Dev Tech "'in a personal and individual way' and not be a generalized grievance." *All. for Hippocratic Med.*, 602 U.S. at 381 (quoting *Lujan*, 504 U.S. at 560, n.1). Under Dev Tech's own argument, for it to have suffered the injury that could result from this alleged error, Dev Tech would need to have a CPA-audited system. Yet nowhere in the complaint does Dev Tech make the necessary allegation that it has, to use its own words, "equally acceptable, if not better, systems that are compliant with all applicable regulatory requirements." ECF No. 1 ¶ 31.

Without such information, the Court cannot assess what differences, if any, exist between a hypothetical CPA-audited system and a government-audited system. In fact, the Court does not know if Dev Tech even has a system that could pass a CPA audit. All Dev Tech offers the Court is extra-record information from the websites of accounting firms that claim that they can, if asked, audit systems to the government standard. *See* ECF No. 19 at 19 n.8. Beyond being outside the administrative record, this information does not relate in any way to Dev Tech's systems. Instead, it merely speaks to the fact that several accounting firms advertise the capability to audit to federal standards—not to Dev Tech's capability to meet those standards.

Dev Tech did not need to go to extraordinary lengths to allege standing related to this alleged agency error. Rather, Dev Tech could have alleged that it has a CPA-audited system or would and could have attained one in time to bid on the solicitation, if that was in fact the case. *See Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 532–33 (2010) (finding that standing existed where the plaintiff "has shown that it engages in the type of business that is the subject of the contract, has in fact successfully performed such contracts in the past, and has represented that it could find another teaming partner in the event it submitted an offer in a re-competition . . ."). The injury Dev Tech alleges only relates to the differential between the maximum number of points an offeror with a government-audited system could be awarded versus the maximum number of points an offeror with a CPA-audited system could be awarded. Therefore, standing to pursue this alleged injury requires a protestor to have a CPA-audited system or, at the very least, plausibly allege that it could have attained a CPA audit of its systems prior to the solicitation deadline. Instead of making any allegations along these lines in its complaint, Dev Tech simply states in three places that "Dev Technology is prejudiced simply because it has not been unilaterally selected by the Government for a Government audit." ECF

No. 1 ¶¶ 52, 57, 61.[3]  Beyond being a legal conclusion, this single statement says nothing about the key fact to show standing: Dev Tech's possession of, or ability to attain, a CPA-audited system.

Dev Tech fares no better on the merits.  Rather than even attempting to meet its burden to prove that it was prejudiced by the alleged error, Dev Tech merely states that it "could" ensure that its systems meet the government's standards but fails to point to any facts to attempt to prove this.  *See* ECF No. 19 at 21 ("Dev Technology is directly prejudiced as it has not been selected for audit/review of its systems by the government, but *could* ensure that its systems meet all federal requirements through a CPA audit.") (emphasis added).  A one-sentence, conclusory statement that Dev Tech "could" do something, without more, does not meet Dev Tech's burden of proof on prejudice.  Dev Tech cannot be prejudiced by this alleged error without showing that it could earn *any* points for its business systems.

In sum, based on Dev Tech's complaint and its MJAR (and the administrative record itself), there is no basis for the Court to conclude that the alleged error, if corrected, would have any effect on Dev Tech.  Pleading and proving injury are not mere formalities; they are requirements under Article III (standing) and 28 U.S.C. § 1491(b)(1) (prejudice).  As Judge Tapp put it, "even 'violations of law,' let alone innocuous mistakes, should not result in setting aside awards unless those mistakes have some significance, for '[a]ny good lawyer can pick lint off any Government procurement.'"  *Ginn Grp., Inc. v. United States*, 159 Fed. Cl. 593, 608 (2022) (alteration in original) (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 932 (Fed. Cir. 1992)).  Here, Dev Tech fails to either plausibly allege or prove that this alleged procurement error is of any individualized significance to it.

### c.  Dev Tech fails to allege standing or prove prejudice from the solicitation's subcontractor verification requirements for emerging technology experiences.

Next, Dev Tech challenges Section L.5.2.4.2 of the solicitation, which allows an offeror to use services it provided as a subcontractor to earn points for emerging technology relevant experiences.  ECF No. 1 ¶¶ 42–45; ECF No. 19 at 16–17; *see* Tab 44 at AR 6204–06.  Dev Tech contends that this provision is unreasonable and unnecessary to satisfy the agency's legitimate needs because it requires the signature of the prime contract's contracting officer for a subcontractor to earn points for verified experiences in emerging technologies.  ECF No. 19 at 16.  Dev Tech asserts that "[w]hile it is reasonable to require verification of the scope of work an offeror performed as a subcontractor, subcontractors are . . . not in privity with the government and often are restricted by subcontract language from contacting government contract officials concerning the work performed."  *Id*.  Accordingly, Dev Tech argues that the existence of other more reasonable alternatives for verification makes this requirement irrational and "prevents an offeror from utilizing its experience as a subcontractor . . . ."  *Id*. at 17.  Specifically, Dev Tech asserts that "a signed verification of the work performed by the prime contractor's contracting official . . . would provide the same assurance as a government contracting officer's verification."  *Id*.  Dev Tech alleges that it "is prejudiced by this unreasonable provision by

---

[3] The third iteration of this quotation substitutes the word "review" for "audit."

eliminating the presentation of prior experience as a subcontractor that demonstrates its capability to perform future task[] orders to be completed under Alliant 3." *Id.*

Here again, Dev Tech attempts to walk the Court through an alleged error in the solicitation without alleging (or proving) that it could earn points if the error were corrected. Dev Tech's conclusory allegation that it is prejudiced because "*an* offeror" might be prevented from utilizing its subcontractor experience is insufficient to meet its burden of showing that *it* was prejudiced by the provision.  Dev Tech must allege that *it* was *"an* offeror" that could not earn points because of this alleged error.  Instead, Dev Tech only states that it was "prejudiced by this unreasonable provision" where it offers its experience as a subcontractor and not a prime contractor.  *Id.* at 17.  But Dev Tech does not allege facts supporting this conclusory statement. Indeed, from Dev Tech's complaint, it is unclear whether Dev Tech has ever been a government subcontractor—a question Dev Tech failed to satisfactorily answer when it was raised at oral argument.  *See* ECF No. 31 at 106:10–107:18 (discussion between Court and Dev Tech's counsel at oral argument regarding this flaw in pleading to which Dev Tech's only response was to assert that standing was supported by the circular "self-evidence rule . . . we wouldn't be here pleading this if [we didn't have standing]").  Absent "further factual enhancement," Dev Tech's conclusion that it was prejudiced constitutes a "naked assertion" that the Court need not heed. *See Twombly*, 550 U.S. at 557.  The Court simply cannot assess the impact of this alleged error without more from Dev Tech.  Dev Tech's allusions to the fact that subcontractors are "often" restricted by subcontract language from engaging with government officials does not resuscitate its case—its generalizations are unmoored from how it, the protestor, is affected by the alleged error.  *See* ECF No. 19 at 16.  In sum, Dev Tech fails to plausibly allege that it has standing to bring this protest ground or, on the merits, to prove that it was prejudiced by the error it alleges.

Dev Tech could have demonstrated that it had standing and was prejudiced in a number of ways.  Dev Tech could have alleged that *it* was a subcontractor to a government contract that was prohibited by that contract's terms from contacting government officials.  Likewise, it could have alleged that it had tried to get a contracting officer's signature to verify its subcontract work but was unable to do so.  Even more fundamentally, Dev Tech does not even outright state that it has verifiable subcontractor experience in emerging technologies or tried to verify its subcontract work under its understanding of this solicitation provision.  Rather, all Dev Tech alleges is that "Dev Technology is prejudiced by the unreasonable requirement where it offers its experience as a subcontractor and not a prime contractor."  ECF No. 1 ¶ 45.  Dev Tech leaves the Court with no information whatsoever on whether Dev Tech has a subcontract that this solicitation provision prevented it from using.  Instead, Dev Tech asks the Court to overturn the agency's decision on the basis that some hypothetical prospective offeror might have difficulty satisfying this solicitation requirement because of hypothetical subcontract language restricting the hypothetical prospective offeror from contacting the government.  *See, e.g., Dollison v. Wilkie*, 750 F. App'x 986, 989 (Fed. Cir. 2018) (dismissing the case because "unsubstantiated and hypothetical statements fail to demonstrate a concrete and particularized injury in fact"); *Pernix Grp., Inc. v. United States*, 121 Fed. Cl. 592, 599 (2015) (with regard to ripeness, observing that "[i]n the bid protest context, there is no measurable hardship, at the time of the protest, flowing from a future, hypothetical agency decision adverse to the protestor").  None of this amounts to plausibly alleging standing in its complaint nor proving on the merits that the agency's alleged error was prejudicial.

Additionally, the government asserts that Dev Tech's interpretation of the verification requirement is incorrect. Indeed, the government presents evidence that "the solicitation *already* permits [the] alternative verification method" that Dev Tech contends is reasonable. ECF No. 20 at 29 (emphasis in original); *see* Tab 44 at AR 6206. Attachment J.P-3 of the solicitation "allows for a signature by a 'Cognizant Project Official'—not merely a cognizant government official." ECF No. 20 at 30 (quoting Tab 44c at AR 6242). In short, the government contests the premise of Dev Tech's entire argument on this matter. Tellingly, Dev Tech's failure to attempt to verify its subcontract experience or offer other facts asserting its prejudice does little to illuminate this purported ambiguity in the solicitation's terms. *See* ECF No. 31 at 110:3–920.

### d.    Dev Tech fails to allege standing or prove prejudice from the points award scheme for emerging technology experiences.

Penultimately, Dev Tech protests Section L.5.2.4 of the solicitation, which awards points for emerging technology relevant experience submissions. *See* ECF No. 1 ¶¶ 39–41; Tab 44 at AR 6231–32. While Dev Tech states it "understands the importance of [emerging] technologies for the next decade, during which the Alliant 3 contract will be active[,]" ECF No. 25 at 8, it asserts that it was unreasonable for the agency to award higher points for the third set of relevant experience submissions in each emerging technology category, *see* ECF No. 19 at 15–16. Specifically, the solicitation "awards 100 points each for the first eleven Emerging Technology Relevant Experience Projects, 200 points for the second eleven, and 300 points for the third eleven . . . ." ECF No. 19 at 15. Dev Tech contends that it is unreasonable to score "the third eleven projects as being three times more valuable than the first eleven projects." *Id*.

The government responds that "[a]warding increasing points to offerors with the 22 or 33 occurrences of emerging technology projects is a rational way for GSA to advance its goal of evaluating and scoring offerors 'based on their technical experience with [emerging technologies].'" ECF No. 20 at 28 (alteration in original) (quoting Tab 12 at AR 1256). The government argues that awarding "more points corresponding to more experience with each instance of emerging technology" allows for the agency to select a more qualified pool of contractors for Alliant 3 that are capable of performing IT services over the duration of the procurement. *Id*. Furthermore, in its decisional documents, the agency stated that "many [Alliant 3] task orders involve multiple technologies and multiple emerging technologies. It is important that Alliant 3 awardees are prepared to handle complex integrated IT service projects involving multiple emerging technologies, thus the planned scoring element is reflective of the required evaluation factors to satisfy agency customer needs." Tab 12 at AR 1256.

Dev Tech again relies on speculative generalities to allege its standing to challenge, and prove that it was prejudiced by, this provision. In its complaint, Dev Tech only alleges that it, "as a mid-sized company, is prejudiced by the unreasonable requirement that benefits only the largest of companies." ECF No. 1 ¶ 41. But Dev Tech fails to allege any facts that support this sole conclusory sentence. Moreover, in its MJAR briefing, Dev Tech asserts it is prejudiced "by not being able to earn the exaggerated number of points that will be earned by the very largest of companies." ECF No. 19 at 16. Yet Dev Tech does not offer any proof in its MJAR briefing that it has any emerging technology relevant experience projects. Thus, the Court cannot assess how this provision affects Dev Tech other than by impermissibly speculating that as a "mid-sized

company," Dev Tech might have fewer emerging technology projects than a larger business. However, the Court cannot rely on speculation to supply an injury-in-fact or merits prejudice bereft of supporting factual allegations. The Court cannot categorically assume that *every* offeror that is not a large business is prejudiced by this provision without more, and Dev Tech has provided the Court with nothing to support how *it* specifically is injured by the provision.

Moreover, the provision rationally awards offerors more points for more experience with emerging technologies. The agency stated that it wanted to implement a scoring system that "reflects the anticipated future importance of these [eleven] ETs," because "[these ETs are] integral to the future of IT services . . . [and it is important] that Offerors are evaluated and scored based on their technical experience with ETs." Tab 12 at AR 1255, 1256. It follows that the agency would award points commensurate to greater experience in emerging technologies because they are critical to Alliant 3. More relevant experience with these technologies is an indicator of an offeror's ability to "handle complex integrated IT service projects involving multiple emerging technologies." *Id*. at AR 1256. Contrary to Dev Tech's assertions, the agency did not need to spell this out explicitly in its decisional documents—this rationale was self-evident on the face of the provision awarding more points for more experience. Indeed, solicitations commonly rate offerors more favorably if they have greater relevant experience. *See, e.g.*, *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 130 (2022), *aff'd*, No. 2022-1949, 2023 WL 8534614 (Fed. Cir. Dec. 11, 2023) (finding that it was permissible for the government to weigh relevant experience). Effectively, Dev Tech argues that the agency should eliminate the highest rated category of this scoring provision because Dev Tech might not be able to achieve the highest score. Dev Tech's argument is akin to arguing that an agency should eliminate the "Outstanding" or "Very Relevant" adjectival ratings in a more typical solicitation scoring system because an "Acceptable" or "Somewhat Relevant" rating is good enough.

Furthermore, Dev Tech does not question the agency's identification of the eleven emerging technology categories that the agency determined are "the most likely ETs to become relevant for use in Alliant 3." Tab 12 at AR 1255. Nor does Dev Tech challenge the agency's decision to award points for relevant experiences in these emerging technologies. Dev Tech does not even challenge the agency awarding points for up to thirty-three submissions of emerging technology experience. *See* Tab 44 at AR 6158. It also does not challenge that the agency awarded twice as many points for the second eleven projects than it did for the first eleven. *See id.* at AR 6231. Rather, Dev Tech solely challenges how these points are distributed for the third set of eleven projects. *See* ECF No. 19 at 16 ("Valuing certain emerging technology projects at *three times* the value of others runs counter to the evidence before the agency . . . .") (emphasis added). In essence, the agency built a ladder of reasoning to support its decision to implement its points award system for emerging technology. Here, Dev Tech concedes all but the top rung of the ladder yet fails to allege or prove it could even climb up to that topmost rung.

### e.    Dev Tech fails to allege standing or prove prejudice from the solicitation's provisions awarding points for relevant experience projects with up to seven unique federal agencies.

Finally, Dev Tech argues that the agency's decision to award additional points for relevant experience projects with up to seven unique federal government customers is irrational.

ECF No. 25 at 7 ("The Government provides no explanation or reasonable basis for requiring <u>seven</u> different federal customers . . . .") (emphasis in original); *see also* ECF No. 19 at 14 ("It prejudices Dev Technology . . . without the experience of working for seven <u>different</u> federal agencies but a long history of working with government customers.") (emphasis in original). Dev Tech asserts that because just twelve of the forty-nine Alliant 2 contractors did work for seven or more agencies, this provision "favor[s] the very largest of offerors without a rational basis of showing that the number of agency customers is a reliable distinguishing factor among companies." ECF No. 19 at 13–14. Dev Tech states that most solicitations "make no distinction as to requiring performance at different agencies"; accordingly, "[u]tilizing multiple agency experience runs counter to the evidence before the agency and is a restrictive provision that exceeds the necessary needs of GSA." *Id*. at 14.

The government responds that "[t]his provision rationally advances GSA's needs to ensure a proficient contractor pool for this Governmentwide IT procurement." ECF No. 20 at 20. The agency found that "the historical multi-agency usage rates from Alliant 2 will likely continue into the Alliant 3 contract," and "enlisting contractors with experience in managing multiple agency customers should play a moderate role in the evaluation scoring of the [solicitation]," Tab 23 at AR 1409. Therefore, the agency decided to award 500 points for each relevant experience project with a unique federal customer, comprising less than four percent of the maximum possible points. *See* Tab 44 at AR 6230, 6234 (showing that this provision comprises 3,500 out of 88,200 maximum points).

As is obviously an all too familiar pattern at this point, in its complaint Dev Tech only makes the conclusory allegation that "Dev Technology, as a mid-sized company, is prejudiced by the unreasonable requirement that benefits only the largest of companies." ECF No. 1 ¶ 38. Dev Tech states that this provision favors only the largest of offerors, "as they are most likely to have a broader portfolio of work with different federal agencies." *Id*. Dev Tech offers no factual allegations in its complaint to support this conclusion or that relate to Dev Tech's capabilities— or even the capabilities of mid-sized companies more generally (an undefined category in Dev Tech's complaint). On the merits, Dev Tech states that it was prejudiced by this provision because it is "a mid-sized company with the skill level to perform the type of work anticipated to be completed under Alliant 3, but without the experience of working for seven different federal agencies but a long history of working with government customers." ECF No. 19 at 14 (emphasis omitted). But Dev Tech's broad conclusory statements do not provide the Court with any factual allegations regarding Dev Tech's capabilities and its experience with different federal agencies. Without such factual allegations, Dev Tech does not meet its burden of plausibly alleging standing or proving prejudice on the merits. *Warth*, 422 U.S. at 518 ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."). Dev Tech would have the Court assume, without laying any factual foundation, that it is a "mid-sized company"; that being a "mid-sized company" has some significance with regard to the number of federal agencies for which such a company has performed services; and, most importantly, that if the cap on the number of relevant experience projects was lower than seven, Dev Tech would be able to more competitively compete for the procurement at issue. The Court cannot draw all these conclusions in Dev Tech's favor without plausible factual allegations in Dev Tech's complaint and support in its merits briefing.

Moreover, Dev Tech ignores the fact that this provision operates equally as a ceiling to the number of points that an offeror can earn for servicing unique federal customers. Indeed, a company like Science Applications International Corporation, which worked with fifteen different federal customers for Alliant 2, is actually disadvantaged by this upward limit on points earned from providing services to different federal clients. Tab 23b at AR 1413. In fact, twelve of the forty-nine prime Alliant 2 contractors worked with more than seven federal agencies and are thus unable to earn points over the seven-agency limit. *Id.* Without Dev Tech contextualizing its own capabilities, the Court cannot determine how the ceiling affects Dev Tech. Does the ceiling harm Dev Tech? Or rather, does it function to benefit Dev Tech? Dev Tech's failure to plausibly allege how it is affected by this ceiling fatally leaves these questions unanswered.

Furthermore, Dev Tech's argument that "most solicitations . . . make no distinction as to requiring performance at different agencies" does not help its case. ECF No. 19 at 14. First, this argument says nothing about Dev Tech's standing or merits prejudice. Second, as the agency notes, the Alliant 3 contract is not "most solicitations." *See* ECF No. 20 at 4. Rather, it is a GWAC intended to provide IT services across the federal government. *See id.*; Tab 44 at AR 5926. Alliant 3 is the intended successor of Alliant 2, which is currently the largest GWAC administered by any agency. Tab 9 at AR 1145. It is not unreasonable for the agency to fashion unique means to service unique ends, so long as they are supported by record evidence. Here, the agency provides ample reasoning for its decisions regarding the solicitation, finding that "75% of Alliant 2 prime contractors support multiple agency customers." Tab 23 at AR 1409. Accordingly, the agency decided that "enlisting contractors with experience in managing multiple agency customers should play a moderate role in the evaluation scoring of the Alliant 3 contract." *Id.*

Additionally, the Court notes that Dev Tech effectively challenges the wrong provision of the solicitation. Section L.5.2.3.4 is linked to Sections L.5.2.3.1 and L.5.2.3.2 of the solicitation, which allow an offeror to submit "a maximum of seven (7) distinct Primary NAICS Code Relevant Experience Projects," reflecting past performance in one of the acceptable NAICS codes outlined in the solicitation. Tab 44 at AR 6186 (emphases omitted). Once the agency determined that allowing seven submissions was rational, it was also rational for the agency to conclude that awarding additional points for servicing different agency customers would ensure a contractor pool capable of working with different agencies. If Dev Tech's only qualm is that seven is too high a number, Dev Tech again allows the agency to build a ladder of reasoning to support its decision but only takes issue with the last rung. Dev Tech does not challenge the agency's decision to allow seven relevant experience project submissions. According to its representations at oral argument, it does not even appear to object to the premise of awarding extra points for experience with different agencies. *See* ECF No. 31 at 13:10–23. Rather, Dev Tech contests that seven is too many federal agencies. *See id.* at 13:20-23. But, as the government puts it, "there is no reason why Dev Technology's experience should provide the cap for the number of experiences with unique Federal agencies that may be advantageous for a contractor on the Alliant 3 procurement." ECF No. 28 at 7; *see also* ECF No. 31 at 17:24–18:5. And thus, Dev Tech once again challenges the top rung of the ladder, without making the requisite showing that it can reach that last rung in the first place.

21

## CONCLUSION

For the reasons set forth above, Dev Tech fails to establish that it has standing to bring this bid protest broadly or, more specifically, that it has standing to challenge any of the solicitation provisions for which it alleges error.  Accordingly, the Court must dismiss Dev Tech's complaint for lack of subject matter jurisdiction.  The Clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED**.


s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge